UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KATE BERGERON,                              :
       Plaintiff,                          :
                          :
       v.                                  :   C.A. No. 15-467M
                          :
CAROLYN W. COLVIN, ACTING                   :
COMMISSIONER OF SOCIAL SECURITY,            :
       Defendant.                          :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

       Plaintiff Katie Ryan Bergeron seeks disability benefits based on the chronic pain of fibromyalgia and disc degeneration exacerbated by mental impairments.  The matter is before the Court on Plaintiff's motion to reverse the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act ("SSA"), 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act").  Plaintiff contends that the Administrative Law Judge ("ALJ") erred in determining that neither fibromyalgia nor lower back pain amounts to a severe physical impairment, that the mental residual functional capacity ("RFC")[1] findings are not supported by substantial evidence, and that the evaluation of Plaintiff's credibility is flawed.  Defendant Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

       This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I find that

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

the ALJ's findings are sufficiently supported by substantial evidence and that the errors in his analysis are not material.  Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 9) be DENIED and Defendant's Motion for an Order Affirming the Commissioner's Decision (ECF No. 10) be GRANTED.

## I.     Background Facts

### A.     Plaintiff's Background

Plaintiff was only thirty when she stopped working on her alleged onset date of May 2, 2011, and thirty-two when the ALJ issued his decision.  Tr. 163, 171.  When she was a child of sixteen, she was involved in a very serious motor vehicle accident resulting in a broken right femur, a broken left wrist, and a lacerated liver; she had multiple surgeries in the aftermath of the accident, including procedures to remove surgical hardware and bone fragments from her right leg.  Tr. 293-96, 301-16.  Despite the accident and its consequences, Plaintiff went on to complete her education, earning an associate's degree in radio broadcasting.  For ten years, she worked successfully in that field as a radio production manager and traffic producer, earning more than $42,000 in the three years preceding the year of alleged onset.  Tr. 41-42, 187-88, 215-19.  She claims that she stopped working on May 2, 2011, because she was in such constant pain that "[t]here were a lot of days" when she could no longer get out of bed.  Tr. 54.

Throughout the period of alleged disability, Plaintiff claims that she has lived alone with a small dog.  Tr. 44, 59, 206.  Since stopping work in 2011, she has been assisted by a friend, who lends her money, pays her rent of $750 a month, takes her to medical appointments, does the shopping, cleans the apartment, gets the mail, and feeds the dog.  Tr. 42, 44, 46, 53-54, 57. While Plaintiff explained that her lack of medical treatment was caused by her lack of medical insurance, she added that she was able to afford Dr. Jack Mourad (the internist/rheumatologist

who is the only longitudinal treating medical provider during the period of disability) because "[m]y friend was paying for a lot of the appointments."  Tr. 59.

As a result of her disabling limitations, Plaintiff claims that she lays in bed for twenty-two to twenty-four hours a day and engages in no daily activities beyond putting frozen food in the microwave, occasionally reading for twenty minutes, making sure the dog's bowls are full, and watching television.  Tr. 48, 51; see Tr. 206 ("I am bedridden").  She also claims that her agoraphobia and anxiety are so severe that she cannot even leave her apartment to retrieve the mail; in addition, she claims that her frequent anxiety attacks make it impossible for her to go out alone.  Tr. 207, 209.  Because her pain makes standing for any period of time impossible, she bathes only twice a month and has her friend cut and color her hair every eight months.  Tr. 207.

In support of her disability applications, Plaintiff submitted a daily "pain and fatigue" log that she affirmed to be true,[2] in which she recorded her daily symptoms, pain severity (on a scale of one to ten) and time spent lying down every day from January 23, 2013, through June 30, 2013, and the month of October 2013 – a total of more than six months.  Tr. 249-59.  According to the logs, Plaintiff spent twenty-two to twenty-four hours of every day lying down (except on days when she had medical appointments), endured constant pain usually at the level of eight, nine, or ten out of ten (rarely seven), and experienced daily "manic depression, agoraphobia and insomnia," as well as either "chronic pain" or "fibromyalgia" and occasional panic attacks.  Tr. 249-59.

### B.      Plaintiff's Medical History

Despite Plaintiff's testimony that she has not driven a car since 2011 and that, on May 2, 2011, she stopped working because of constant pain, the only medical treatment leading up to the date of onset are two records from an unrelated plastic surgery on her nose in 2010.  Tr. 317-18.

---

[2] Plaintiff affirmed that all information "given in connection with this claim is true."  Tr. 164.

Three weeks after onset, on May 25, 2011, Plaintiff had an imaging study done of her elbow, which confirmed the presence of a needle fragment in the bone.  The report notes the absence of effusion and notes that all bone structures were intact; it makes no recommendation for follow up.  Tr. 321.  Otherwise, Plaintiff appears to have received no medical treatment at all for both the full year before and the full year after the onset of disability.

The first reference to any treatment after onset is an MRI of the lumbar spine performed a year later, on May 15, 2012, which shows mild and moderate loss of disc height and mild stenosis.  Tr. 261-62, 283-84.  This MRI was performed in Pompano Beach, Florida; the record does not explain how someone suffering from chronic pain, agoraphobia and panic attacks so severe as to leave her unable to leave her home came to be in Florida for this MRI.  The MRI report makes no treatment recommendations[3] and there is no evidence that any medical provider recommended any treatment based on the findings in the report.  Tr. 280.

Other than the Florida MRI of the lumbar spine and the imaging study of the elbow, neither of which resulted in any treatment recommendations, there are no disability-period medical records until October 3, 2012, nearly a year-and-a-half after the alleged onset date.  On that day, Plaintiff had the first of thirteen appointments with the internist/rheumatologist, Dr. Jack Mourad.  Tr. 273-82, 327, 332-34.  She complained of greatly increased pain in her jaw, as well as pain in her neck, back, and shoulder, which she had been experiencing since her childhood car accident.  Tr. 273.  In the note for this initial encounter, Dr. Mourad wrote down Plaintiff's "Problem List:" joint pain, "FMS" (fibromyalgia), anxiety and depression, migraine, insomnia, and fatigue.  Id.  In handwriting that is extremely difficult to decipher, he appears to record that Plaintiff told him she had been prescribed Percocet for fibromyalgia, Klonopin for

---

[3] At the hearing, Plaintiff testified that she "may be able to have surgery" on her back.  Tr. 45.  When challenged regarding the source of this statement, she stated that the Florida doctor who sent her for the MRI thought she might have back surgery.  Tr. 46.  Nothing in the record confirms this testimony.

anxiety and depression, and Ambien for insomnia; this note also refers to a list of other medications, but no list appears in the record.  Id.  No records confirm this history.  On physical examination, Dr. Mourad recorded "+ tender trigger point" and "+ L/S spine tender."  Id.

The second appointment note (October 31, 2012) is written on the form that Dr. Mourad used for the balance of his encounters with Plaintiff.  It records her complaints of leg pain and "aching all over – jaw, neck, knee LBP."  Tr. 281.  It reflects a box-checked physical examination with all normal findings (including normal motor strength), except for "+ multiple trigger point.  L/S spinal tenderness."[4]  In an apparent reference to his diagnoses and treatment plan, Dr. Mourad wrote, "Chronic pain/FMS" and "MS Contin"[5] with a dosage, as well as "ref to Providence Center."  Tr. 281.  Notwithstanding this reference, there is no suggestion in the record that any such referral was made or that Plaintiff ever went to the Providence Center.

By the next appointment, on November 28, 2012, based on her complaint that she was "feeling sore all over" and the finding on physical examination of "+ L/S spine tender," Dr. Mourad appears to have added a prescription for Klonopin.[6]  Tr. 282.  At the January 4, 2013, appointment, Plaintiff said she had "good days and bad days," while Dr. Mourad recorded "+multiple tender trigger point."  Tr. 274.  Otherwise, everything was normal.  He appears to have continued the same treatment – medication and nothing else.  Id.  At the February appointment, Plaintiff gave Dr. Mourad a copy of the year-old Florida MRI which had indicated

---

[4] These findings are followed by another very brief entry that is illegible but possibly indicates reduced range of motion.  Tr. 281.

[5] "MS Contin" refers to morphine sulfate (extended-release).  It is described in a safety disclosure by the Federal Drug Administration as "[a] strong prescription pain medicine that contains an opioid (narcotic) that is used to manage pain severe enough to require daily around-the-clock, long-term treatment with an opioid, . . . that can put you at risk for overdose and death."  Medication Guide – MS Contin, http://www.fda.gov/downloads/Drugs/DrugSafety/UCM311374.pdf (viewed on August 19, 2016).

[6] Klonopin is a prescription medicine used alone or with other medicines to treat panic disorder with or without fear of open spaces (agoraphobia) in adults.  It can cause abuse and dependence.  Medication Guide – Klonopin, http://www.fda.gov/downloads/Drugs/DrugSafety/UCM225680.pdf (viewed on August 19, 2016).

mostly mild findings.  Tr. 280-83.  Apart from noting that he got it, the MRI did not affect Dr.

Mourad's treatment in that he continued to prescribe strong pain medication and nothing else.

Tr. 280.  At the March 3, 2013, appointment, Dr. Mourad appears to have added Ambien to MS

Contin and Klonopin, based on Plaintiff's complaint of "poor sleep – medication not working."

Tr. 275.  At the next two appointments, both in April 2013, Dr. Mourad apparently did not

perform physical exam.  Tr. 277-78.  When Plaintiff returned in July for the next two

appointments, Dr. Mourad's notes again reflect only Plaintiff's complaints of aches and pain

("back + jaw 8/10") but no clinical findings (except for "MUSC +" at one appointment).  Tr.

276, 279.  Meanwhile, with no recorded explanation, Dr. Mourad appears to have switched

Plaintiff from MS Contin to Percocet.[7]  Tr. 279.  He also noted that he had referred Plaintiff to a

"pain management center," but there is no evidence of an actual referral or that Plaintiff was ever

treated by a pain specialist.  Id.  Dr. Mourad's final four sets of treatment notes – for September

25, October 28, and December 23, 2013, and February 14, 2014 – are even less legible because

the copies are of poor quality.  Tr. 327, 332-34.  They appear consistently to reflect Plaintiff's

complaints ("pain level up"; "crying in office"; "aching all over"), the diagnoses of FMS and

LBP and, on one of them, a finding of "+multiple tender trigger point."  Tr. 327, 332-34.

Apart from Dr. Mourad's intermittent inclusion of depression and anxiety on his list of

diagnoses (the last such reference is in his note of July 1, 2013) and his prescription for

Klonopin, the record reflects no mental health clinical observations, testing or treatment.  When

asked at a subsequent appointment with SSA consulting psychologist Dr. Unger, Plaintiff

confirmed that she had never had inpatient or outpatient mental health treatment.  Tr. 268.  Also

---

[7] Percocet is prescribed to treat "moderate to moderately severe pain"; it carries the warning that it may be abused in a manner similar to other opioid agonists.  PDR – Percocet, http://www.pdr net/drug-summary/Percocet-acetaminophen-oxycodone-2483 (viewed on August 19, 2016).

missing from Dr. Mourad's treating notes is any reference to when and why he prescribed birth control for Plaintiff.  See Tr. 200.

In her SSA filing on February 4, 2013, Plaintiff identified Dr. Mourad as her only treating provider during the relevant period.[8]  Tr. 224.  The next day a records request was sent to him. Tr. 66, 77.  For reasons not disclosed in the record, Dr. Mourad did not respond for months.  He finally provided SSA with his records on July 30, 2013, well after Plaintiff's claim was denied at the initial level on April 26, 2013. Tr. 73-74.

### C.    Opinion Evidence

On April 3, 2013, Plaintiff was seen by an SSA consulting physician, Dr. William Palumbo, for a consultative physical examination.  She told Dr. Palumbo that she had been diagnosed with fibromyalgia two months before and was suffering from constant pain in her entire body (especially in her neck, back, legs, ankles, and jaw) and from frequent panic attacks and agoraphobia.  Tr. 264-65.  According to her log, by the time Dr. Palumbo saw her, she had been in bed almost twenty-four hours a day for more than two months.  See Tr. 249, 254-56. Nevertheless, Dr. Palumbo observed that she got on and off the examination table without difficulty, dressed herself without assistance, and had a normal gait and full, unrestricted range of motion.  Tr. 264-65.  Despite her claim that she had been bedridden for months, Dr. Palumbo found no evidence of muscle atrophy.  Plaintiff was able to bend at the waist without any apparent discomfort; she had no obvious neurological deficits; and straight-leg-raise testing was negative bilaterally.  Id.  He found no evidence to support the fibromyalgia diagnosis, noting that

---

[8] Plaintiff also identified Hasbro Children's Hospital as providing the care she received as a child following the 1997 motor vehicle accident; Hasbro provided those records.  Tr. 293-316.  In addition, Plaintiff claimed she had received care at North Providence Primary Care from May 2000 through May 2012, well into the period of alleged disability. Tr. 203.  When asked, this provider promptly responded to SSA that it had no records for Plaintiff in the pertinent period.  Tr. 66, 77, 263.  At the hearing, Plaintiff's counsel confirmed that the record as presented was complete.  Tr. 39.

her musculoskeletal examination was unremarkable.  Tr. 265.  Significantly, in light of her claim

that she could barely walk and never drove, Dr. Palumbo took the extra step of making the

observation that she walked to her car in the parking lot without difficulty after she left his

office.  Id.

      Three weeks later, on April 22, 2013, Plaintiff was seen by a consulting SSA

psychologist, Dr. William Unger, for an evaluation based on her claims of anxiety, agoraphobia

and manic depression.  Tr. 267-72.  She drove herself to the appointment.  Tr. 267.  On mental

status examination, Dr. Unger found that her concentration was variable, her persistence was

adequate, she was alert and oriented, her speech was clear, she showed no signs of a thought

disorder, and her memory, insight, judgment, and fund of knowledge were intact.  Tr. 269-70.

Plaintiff told Dr. Unger that, since childhood, she has experienced symptoms of depression,

panic disorder with agoraphobia, and panic attacks three or four times per week, each lasting

fifteen to twenty minutes; she claimed to be unable to leave her home and said that she only

leaves her bedroom with difficulty.  Tr. 270.  Despite these claims, Dr. Unger did not diagnose

either manic depression or agoraphobia.  Rather, he diagnosed panic disorder without

agoraphobia and "depressive disorder, not otherwise specified," with a Global Assessment of

Functioning ("GAF") score of 48.[9]  Tr. 270-71.  Plaintiff told Dr. Unger that she had no "history

of inpatient or outpatient psychiatric treatment."  Tr. 268.

      On April 22, 2013, with Dr. Mourad's records not yet produced, SSA physician Dr.

Stephanie Green reviewed the record, which, as to physical impairments, consisted principally of

the Florida MRI and Dr. Palumbo's report.  Tr. 67, 78.  Based on these records, she opined that

Plaintiff did not have a medically determinable physical impairment because there were no

---

[9] This Global Assessment of Functioning ("GAF") score falls into the 41 – 50 range, which indicates "serious impairment in social, occupational, or school functioning."  See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR").

objective medical findings to support diagnoses of fibromyalgia or chronic pain.  Tr. 67-68, 78-79.  A few days later, SSA psychologist Dr. John Warren, reviewed the record and opined that Plaintiff's depression and anxiety (as diagnosed by consulting psychologist Dr. Unger) caused moderate restrictions with respect to activities of daily living, social functioning, maintaining concentration, persistence, and pace, and that she had never had an episode of decompensation.  Tr. 68-69, 79-82.  He concluded that Plaintiff could perform simple tasks, interact appropriately with co-workers and supervisors, and adapt to routine workplace changes; however, she could not interact appropriately with the general public.  Tr. 71, 82.  Based on these opinions, Plaintiff's application was denied.  Tr. 73-74.

Dr. Mourad's records were finally provided during the reconsideration phase, on July 30, 2013.  Tr. 90, 102.  A little over a month later, on September 4, 2013, a second SSA physician, Dr. Youssef Georgy, reviewed the updated record.  Dr. Georgy specifically adverted to Dr. Mourad's treating notes, the Florida MRI from 2012, and Plaintiff's pain log.  Tr. 92, 104.  Mindful of those records, he affirmed Dr. Green's assessment that no severe medically determined physical impairment had been established.  Tr. 91-92, 103-04.  On August 20, 2013, a second SSA psychologist, Dr. Jeffrey Hughes, concurred with Dr. Warren's assessment.  Tr. 92-96, 104-08.  At reconsideration, the examiners also recorded their finding that Plaintiff's claims regarding the severity of her symptoms lacked credibility.  Tr. 94, 106.  Based on these opinions, Plaintiff's claims were denied on reconsideration on September 5, 2013.  Tr. 120.

On January 23, 2014, Dr. Mourad signed the first of two opinions.[10]  Tr. 323-26. According to the opinion, Plaintiff suffers from spinal disc degeneration (causing "extreme pain,

---

[10] This first opinion has a notable feature.  With a record loaded with confirmed exemplars of Plaintiff's clear and easily readable handwriting, a lay person's (such as myself) comparison permits the conclusion that Plaintiff herself wrote all of what appears in this opinion except for Dr. Mourad's signature and the date next to the signature. Compare Tr. 206-13, 323-26, with Tr. 328-31.  This conclusion is suggested in the Commissioner's brief.  ECF No.

lack of mobility") diagnosed in May 2012, apparently based on the Florida MRI; depression

(causing "depression, anxiety, insomnia, agoraphobia") diagnosed when she was a teenager; and

fibromyalgia (causing "chronic pain in back, jaw, neck, leg") diagnosed in 2007.[11]  Tr. 324.  The

opinion concludes she is "bedridden" and can only walk or stand for fewer than two hours in an

eight-hour workday, cannot sit at all, and cannot lift any weight.  Tr. 325, 326.  In response to the

final question on the form ("other medical provider who has diagnosed or treated the patient"),

the writer of the opinion filled in "TMH Med Clinic – Dr. Rafelson."  Tr. 326.  No records from

any such clinic are included in the record, despite the confirmation by Plaintiff's counsel at the

hearing that the file "is complete."  See Tr. 39.

The second opinion submitted by Dr. Mourad is dated February 1, 2014, only a week

after the first opinion was signed, although it was not signed until February 19, 2014.  Tr. 328-

31.  While it is on the same form as the first opinion, it is in a very different handwriting, which

appears to be the same nearly illegible handwriting in Dr. Mourad's other medical records.  Id.

While the second opinion generally tracks the first, there are several curious differences: (1)

Plaintiff's weight is different (higher by four pounds); (2) instead of "can not be eliminated,

treatment is necessary for pain," the prognosis is listed as "fair"; (3) instead of stating that

fibromyalgia was diagnosed in 2007, it states that fibromyalgia was diagnosed in 2004;[12] (4)

instead of the conclusion that Plaintiff cannot sit at all, it states that she can sit for up to four

hours; and (5) instead of listing the TMH Med Clinic as another treating provider, it responds to

that question with "N/A."  Id.  Otherwise it opines to job-preclusive physical limitations.

---

10 at 7, n.5.  Plaintiff failed to file a reply memorandum and, therefore, did not respond to the Commissioner's
observation.  The ALJ's decision does not refer to the handwriting issue.  Accordingly, I have not considered it.

[11] This opinion is the first reference to a 2007 diagnosis of fibromyalgia.  There are no records to support the
existence of such a diagnosis.  Plaintiff told Dr. Palumbo she was diagnosed with fibromyalgia in February 2013.
Tr. 264.

[12] There is no evidence of either a 2004 or 2007 diagnosis of fibromyalgia.  See n.11, *supra*.

## II.   <u>Travel of the Case</u>

Plaintiff filed for DIB and SSI on January 23, 2013, Tr. 163-79, alleging that she had

been disabled since May 2, 2011, due to manic depression, anxiety, chronic pain, agoraphobia,

and insomnia.  Tr. 198.  Her applications were denied initially and upon reconsideration.  Tr. 64-

113.  On March 10, 2014, Plaintiff appeared with an attorney and testified at a hearing before the

ALJ.  Tr. 37-63.  A vocational expert ("VE") also testified.  Tr. 62-63.  On April 14, 2014, the

ALJ issued his decision finding that Plaintiff was not disabled.  Tr. 21-36.  That decision became

final on October 13, 2015, when the Appeals Council denied Plaintiff's request for review.  Tr.

1-4.

## III.   <u>The ALJ's Decision</u>

The ALJ decision tracked the familiar five-step sequential evaluation process.  <u>See</u> 20

C.F.R. § 404.1520(a)(4).  At Step One, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since May 2, 2011, her alleged onset date.  Tr. 26.  At Step Two,

based on Dr. Unger's report, the ALJ found that affective disorder and anxiety disorder

constituted severe impairments.  Tr. 26-27.  With respect to back pain and fibromyalgia, the ALJ

found that the record did not establish that they caused more than slight functional limitations.

To support this finding, he relied on the 2012 lumbar spine MRI performed in Florida, which

showed minimal findings and resulted in no treatment, and on the physical observations in Dr.

Palumbo's consultative report which determined that Plaintiff had negative straight leg test

results, full and unrestricted range of motion, including flexion of the back, a normal

musculoskeletal examination, and a normal gait (confirmed by watching her walk to her car).  Tr.

27.  Consistent with this conclusion, the ALJ noted that while the genesis of Plaintiff's

complaints of pain was the 1997 accident, she had worked for many years after the accident.  <u>Id.</u>

Finally, the ALJ pointed out that Dr. Mourad's treating notes did not definitively establish that Plaintiff was properly diagnosed with fibromyalgia in accordance with the criteria in SSR 12-2p, 2012 WL 3104869 (July 25, 2012), because he did not provide a sufficient description of the trigger points to support the diagnosis.  Id.

At Step Three, the ALJ found that Plaintiff's impairments did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 27-28.  Next, the ALJ found that Plaintiff had the RFC for work at all exertional levels, except that she was limited to simple tasks, basic interaction with co-workers and supervisors, and no interaction with the general public.  Tr. 29-31.  At Step Four, the ALJ found that Plaintiff could not perform her past relevant work.  Tr. 31.  At Step Five, the ALJ found that Plaintiff was not disabled because her RFC did not significantly erode the occupational base of unskilled work; therefore, according to the Medical-Vocational Guidelines, she could perform a significant number of jobs in the national economy.  Tr. 31-32; see 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00.

**IV.**     **Issues Presented**

Plaintiff's motion for reversal rests on three arguments – that the ALJ erred in his evaluation of Plaintiff's credibility, that the ALJ erred in determining that Plaintiff had no severe physical impairments, and that the ALJ's mental RFC findings were not supported by substantial evidence.

**V.**      **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision if the ALJ applied incorrect law or failed to provide the Court with sufficient reasoning to determine that the law was applied properly. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary when the evidence establishes

without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir.

2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).  The Court may remand a

case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under

Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086,

1097-98 (11th Cir. 1996).  To remand under Sentence Four, the Court must either find that the

Commissioner's decision is not supported by substantial evidence, or that the Commissioner

incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord

Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was

insufficient to affirm, but also was insufficient for district court to find claimant disabled).

**VI.**    **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe,

making the claimant unable to do previous work, or any other substantial gainful activity which

exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

**A.**    **Treating Physicians**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a

treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F.

Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion

on the nature and severity of a claimant's impairments is well-supported by medically acceptable

clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial

evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L,

2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may

discount a treating physician's opinion or report regarding an inability to work if it is

unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of

Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must

articulate the weight given, providing "good reasons" for the determination.  See Sargent v.

Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where

ALJ failed to point to evidence to support weight accorded treating source opinion, court will not

speculate and try to glean from the record, but will remand so that ALJ can explicitly set forth

findings).

　　　　Where a treating physician has merely made conclusory statements, the ALJ may afford

them such weight as is supported by clinical or laboratory findings and other consistent evidence

of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

When a treating physician's opinion does not warrant controlling weight, the ALJ must

nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and

the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical

evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in

the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion.  20 C.F.R § 404.1527(c).  However, a treating physician's opinion is generally entitled

to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).

　　　　The ALJ is required to review all of the medical findings and other evidence that support

a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for

making the ultimate determination about whether a claimant meets the statutory definition of

disability.  20 C.F.R. § 404.1527(d).  The ALJ is not required to give any special significance to

the status of a physician as treating or non-treating in weighing an opinion on whether the

claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20

C.F.R. § 404.1545-1546, or the application of vocational factors because that ultimate

determination is the province of the Commissioner.  20 C.F.R. § 404.1527(d); see also Dudley v.

Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.    The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§

404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, the claimant is

not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, if a claimant does not have any

impairment or combination of impairments that significantly limit physical or mental ability to

do basic work activities, then the claimant does not have a severe impairment and is not disabled.

20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, if a claimant's impairments meet or equal an

impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. §§

404.1520(d), 416.920(d).  Fourth, if a claimant's impairments do not prevent doing past relevant

work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f); 416.920(e)-(f).  Fifth, if a

claimant's impairments (considering RFC, age, education and past work) prevent undertaking

other work that exists in the local or national economy, a finding of disability is warranted.  20

C.F.R. §§ 404.1520(g), 416.920(g).  Significantly, the claimant bears the burden of proof at

Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart,

267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI

claims).

In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments and must

consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits. Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c). If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

C.      Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10. A reviewing court will not disturb a clearly articulated credibility finding which has substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The lack of a sufficiently explicit credibility finding becomes ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

VII.    Analysis

A.      **ALJ's Credibility Finding**

It is well settled that the credibility determination is critical when the claim of disability is based on fibromyalgia.  Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009) (fibromyalgia is condition established primarily based on subjective pain); Howcroft v. Colvin, C.A. No. 15-201S, 2016 WL 3063858, at *10-11 (D.R.I. April 29, 2016), adopted, No. CA 15-201 S, 2016 WL 3072254 (D.R.I. May 31, 2016) (well-supported credibility finding supports rejection of disability claim based on fibromyalgia); Rodriguez v. Colvin, C.A. No. 15-211-M-LDA, slip op. at 5 (D.R.I. March 17, 2016) (with fibromyalgia, credibility determination is critical to outcome of disability claim).  At the same time, it is equally well settled that a claim of fibromyalgia does not alter the bedrock principle that the ALJ's credibility determination must be afforded due deference by the reviewing court, as long as it is sufficiently supported by specific findings.  See Frustaglia, 829 F.2d at 195.  The ALJ is the individual optimally positioned to observe and assess witness credibility, Mariano v. Colvin, C.A. No. 15-018ML, 2015 WL 9699657, at *10 (D.R.I. Dec. 9, 2015), adopted, 2016 WL 126744 (D.R.I. Jan. 11, 2016), so that "[i]n critiquing the ALJ's credibility determination, this Court is mindful of the need to tread softly, because "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence."  Cruz v. Astrue, No. CA 11-638M, 2013 WL 795063, at *16 (D.R.I. Feb. 12, 2013), adopted, 2013 WL 802986 (D.R.I. Mar. 4, 2013).

In this case, the ALJ's challenged credibility finding was based on his conclusion that Plaintiff's statements concerning her limitations were "not entirely plausible to the extent alleged" for two reasons.  First, he found that her statements were inconsistent with the limited (non-medical) evidence in the record regarding her activities and, second, that her statements were inconsistent with the objective medical evidence.  Tr. 29.

As to her activities, the ALJ's finding that the evidence of Plaintiff's daily routine contradicts her claims of disabling limitations is not supported by the record.  For example, the ALJ notes that Plaintiff "goes on the computer" when the only evidence indicates that she did not have a computer.  Compare Tr. 29, with Tr. 48.  More significantly, Plaintiff's statements that she lay in bed for twenty-two to twenty-four hours per day, that she could not bathe more than twice a month, and that her "friend" did all the cleaning and shopping for her, and even brought in her mail because she could not do it, are consistently asserted throughout the record.  The ALJ is just wrong when he finds that the record reflects that she "is able to care for her personal needs, prepare light meals and do laundry" and therefore is less severely limited than she claims. Tr. 29.  Ironically, it is the hyperbolic consistency of Plaintiff's testimony about her daily activities that operates to undermine her credibility – because it is so dramatically inconsistent with the objective medical evidence.

By contrast with his unsupported conclusion regarding her activities, the ALJ's other finding – that Plaintiff's claim of being almost constantly bedridden and housebound is inconsistent with the objective medical evidence – is amply supported by substantial evidence and is more than sufficient to avoid remand.  For starters, Plaintiff's claim of panic attacks so severe she cannot go out alone is anchored by nothing in the record apart from her subjective statements and is contradicted by her ability to attend both of the consultative examination appointments alone.  Further, there is no reference to the panic attacks in the treating record because she never mentioned them to Dr. Mourad.  This symptom came up only during the interviews with the consultative examiners.  Tr. 264, 270.  Likewise, there is no objective evidence to support her claim of debilitating agoraphobia.  Other than an appearance in Dr. Mourad's opinion and in her statements to the examining consultants, there is no reference in any

treating or other record to this extremely serious condition.  See Tr. 264, 270, 324.  Importantly,

Dr. Unger rejected the diagnosis of agoraphobia, specifically diagnosing panic disorder "without

agoraphobia."  Tr. 270.  Above all, Dr. Palumbo's report of his physical examination and his

observation of her walk to her car are devastating to the credibility of Plaintiff's claims regarding

her extremely severe physical impairments.  She averred repeatedly (most dramatically in her

daily log) that she had spent the months leading up to the Palumbo examination lying in bed for

virtually twenty-four hours a day – this claim clashes with virtually all of Dr. Palumbo's

findings, including his observations of "[n]o evidence of muscle atrophy," "full and unrestricted

range of motions," "gait within normal limits," "able to flex 90 degrees at the waist and

straighten up again without any apparent discomfort," "[b]ilateral leg raise is within normal

limits," "Neurological Exam: Nonfocal," "unremarkable musculoskeletal examination," and

"able to get on and off the exam table without any assistance or problems."  Tr. 265.

All of these jarring juxtapositions are incorporated into the ALJ's credibility finding,

based on the inconsistencies between Plaintiff's statements and the objective medical record.

There is no error in this finding; it is amply supported by the evidence.  To be clear, this is not a

case where the ALJ simply rejected Plaintiff's statements about the intensity of her pain because

they were not substantiated by objective medical evidence – if he had done so, it would be error.

See Adaire v. Colvin, 778 F.3d 685, 687 (7th Cir. 2015).  Rather, the ALJ correctly found that

Plaintiff's statements about her ability to function are directly contradicted by virtually all of the

objective evidence that is well grounded in medically acceptable clinical and laboratory

diagnostic techniques.

With the objective medical evidence supplying overwhelming support for his adverse

credibility determination, I find harmless the ALJ's error in finding inconsistencies between

Plaintiff's statements regarding her disability and her claimed daily activities.  Howcroft, 2016

WL 3063858, at *14 (affirming credibility finding that is still adequately supported by

substantial evidence when erroneous findings are disregarded).  I recommend that the ALJ's

credibility findings be affirmed.

### B.    Plaintiff's Alleged Physical Impairments

The ALJ's Step Two determination that Plaintiff had no severe physical impairments

rests on the finding that neither back pain nor fibromyalgia caused more than slight functional

impairments and is based principally on Dr. Palumbo's physical examination of Plaintiff, which

resulted in entirely normal findings.  Tr. 27.  The ALJ's secondary reasoning for his rejection of

fibromyalgia as a medically determined impairment is based on Dr. Georgy's determination that

Dr. Mourad's treating notes are insufficient to establish the existence of the signs and findings

that are required to support the diagnosis, as well as on Dr. Green's conclusion that Dr.

Palumbo's findings of an unremarkable musculoskeletal examination and normal ability to move

and walk ruled out fibromyalgia.  See Tr. 67, 78.  Plaintiff asserts that both analytical frames

were tainted by error.  Critical to the integrity of both of these determinations is the ALJ's

decision that Dr. Mourad's opinions are not entitled to controlling weight.  My analysis therefore

focuses on Plaintiff's argument that the ALJ's skepticism with regard to Dr. Mourad's records

and opinions amounted to error requiring remand.

The guiding legal principle is well settled – a treating physician's opinion on the nature

and severity of a claimant's impairments is entitled to controlling weight if it is consistent with

the other substantial evidence in the record and is well supported by medically acceptable

clinical and laboratory diagnostic techniques.  Keating, 848 F.2d at 275-76; Konuch, 2012 WL

5032667, at *4-5; 20 C.F.R. § 404.1527(c)(2).  Based on my review of the record, I find that Dr.

Mourad's opinions fail the test.

Because of Plaintiff's failure to seek therapeutic treatment for her symptoms – either for

her back pain and fibromyalgia or for her claimed mental health conditions – during the period of

disability, the other medical evidence of record is limited.  It consists of the Florida MRI; the

consultative report of Dr. Palumbo, who examined Plaintiff in light of her claim that she had

been diagnosed with back pain and fibromyalgia and was housebound by agoraphobia and panic

attacks; and the psychiatric report of Dr. Unger, who examined Plaintiff in light of her claims of

manic depression, agoraphobia, and insomnia.  Tr. 264, 267.  The inconsistencies between Dr.

Mourad's opinions and this evidence could not be more stark.

Focusing first on Dr. Palumbo's report, his consultative examination ruled out both the

diagnosis of fibromyalgia and of extreme pain and lack of mobility of the lumbar spine.  As Drs.

Green and Georgy confirmed, Dr. Mourad's opinions are inconsistent with Dr. Palumbo's

observations of an unremarkable musculoskeletal examination, no difficulty in walking, flexing

or straightening up, and full and unrestricted range of motion of upper and lower extremities.[13]

Similarly, Dr. Palumbo's finding of "[n]o evidence of muscle atrophy" is completely inconsistent

with Dr. Mourad's opinion that Plaintiff's pain had been so severe that she "is bedridden."  Dr.

Mourad's opinion regarding the severity of Plaintiff's back pain is also inconsistent with the May

2012 MRI performed in Florida, which, as the ALJ notes, reflects mostly mild abnormalities.

This MRI was part of the file reviewed by Dr. Green who concluded that the record established

---

[13] Plaintiff argues that Dr. Palumbo's report does not affirmatively mention the absence of trigger points so it is not clearly inconsistent with Dr. Mourad's opinion.  This argument ignores Dr. Palumbo's statement that he performed a "musculoskeletal examination" and found everything "unremarkable."  Tr. 265.  More importantly, this argument fails because Dr. Palumbo's report was reviewed by both of the non-examining physicians, Dr. Green and Dr. Georgy, both of whom concurred, based on Dr. Palumbo's findings, that no severe medically determinable impairment was established.

"No MDI" ("medically determined impairment").  Tr. 68, 79.  Finally, the only other evidence

for the period of disability is Dr. Unger's psychiatric evaluation, which rejected the diagnoses of

manic depression and agoraphobia.  This evaluation contradicts Dr. Mourad's opinion that

Plaintiff has both.  Based on the foregoing, I find that Dr. Mourad's opinions are inconsistent

with all of the other medical evidence in the record.

        In addition, Dr. Mourad's opinions are not "well-supported by medically acceptable

clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1527(c)(2).  Starting with

fibromyalgia, the evidence does not establish that Dr. Mourad ever actually made a medical

diagnosis.  At his first appointment with Plaintiff, Dr. Mourad included fibromyalgia on the list

of "problems," but this list appears to consist of Plaintiff's self-reported complaints.  He failed to

determine whether or not the symptoms met the diagnostic criterion that the widespread pain

must persist for at least three months.  SSR 12-2p, 2012 WL 3104869, at *2.  Rather, Dr.

Mourad's statement in his first opinion that fibromyalgia was diagnosed in 2007 and in his

second opinion that fibromyalgia was diagnosed in 2004 permits the inference that the inclusion

of this diagnosis on the problem list was based on Plaintiff's report of a previous diagnosis,

rather than in reliance on his own clinical assessment.  Thus, the reference to fibromyalgia in Dr.

Mourad's intake note is not "well-supported by medically acceptable clinical and laboratory

diagnostic techniques."

        As Plaintiff correctly argues, whether Dr. Mourad thereafter ever correctly diagnosed

fibromyalgia must be determined by reference to the SSA policy interpretation regarding

"Evaluation of Fibromyalgia" in SSR 12-2p.  It sets out what amounts to "sufficient objective

evidence" to support a diagnosis of fibromyalgia.  2012 WL 3104869, at *2.  According to SSR

12-2p, first, the physician's treating notes must contain evidence to satisfy the general criteria,

including not only a physical examination, but also "the physician's assessment over time of the person's physical strength and functional abilities." Id.  Second, the record must include evidence that the specific diagnostic criteria are present; these are: (1) widespread pain for at least three months; (2) either at least eleven positive tender points or "repeated manifestations of six or more FM symptoms, signs or co-occurring conditions;" and (3) evidence of examinations, laboratory testing or imaging to rule out other disorders.  Id.

Beyond a three-month-long record of pain complaints, Dr. Mourad's notes reflect none of the required evidence of "clinical and laboratory diagnostic techniques."  Despite a place on his form to assess physical strength, Dr. Mourad only once recorded an observation, and that was "motor strength nl [normal]."  None of his treating notes reflect an examination of Plaintiff's functional abilities.  Dr. Mourad did record Plaintiff's subjective complaint of pain for over three months; however, his diagnosis of fibromyalgia was recorded at his first encounter, apparently in reliance on Plaintiff's report that it had been diagnosed previously (in 2004 or 2007).  Tr. 273. Moreover, while Dr. Mourad certainly considered the trigger point criterion, writing "multiple trigger point" on three treating notes (October 31, 2012, January 4, 2013, and December 23, 2013), his notations never assess whether this symptom amounted to the number of trigger points needed to meet the criterion.[14]  Plaintiff argues that these deficits in Dr. Mourad's treating notes are overcome by his references to other symptoms that collectively amount to "repeated manifestations of six or more FM symptoms, signs or co-occurring conditions."  2012 WL 3104869, at 3.  This is simply untrue.  Dr. Mourad's intake note reflects Plaintiff's claim of

---

[14] Plaintiff argues that the ALJ should have contacted Dr. Mourad to ask him how many trigger points he found on the three occasions that his notation described them as "multiple."  If Dr. Mourad's treating notes were not otherwise so deficient, this argument might hold water.  There is no such duty when the treating notes are also inconsistent with the rest of the medical evidence and unsupported by any other objective medical evidence.  See Ferguson v. Comm'r of Soc. Sec., 628 F.3d 269, 273 (6th Cir. 2010) (no duty to re-contact where ALJ rejected treating source opinion "not because the bases of her opinion were unclear to him, but because those bases, Ferguson's self-reported history and subjective complaints, were not supported by objective medical evidence").

migraine, but headache is mentioned only one other time.  Tr. 273, 275.  Only fatigue, depression

and anxiety, and insomnia recur as brief notations; these three references do not fulfill the

alternative diagnostic criteria of at least six repeated FM symptoms.  Finally, Dr. Mourad's

treating notes are devoid of any suggestion that he tried to rule out other disorders, or that he

ordered any laboratory tests or imaging.  He not only never ordered any testing but also did not

even complete the sections of his form reserved for evaluating Plaintiff's extremities, gait, and

neurological functioning, apart from twice noting that the cranial nerves were intact.  For a third

of the appointments, he did not record any examination findings at all.  Based on these

deficiencies, I find that Dr. Mourad's opinion that Plaintiff suffered from disabling fibromyalgia

is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques."

The complete absence of any "medically acceptable clinical and laboratory diagnostic

techniques" also taints both Dr. Mourad's diagnosis of "spinal disc degeneration" resulting in

"extreme pain, lack of mobility" and his diagnosis of "depression, anxiety, insomnia,

agoraphobia."  It is clear from Dr. Mourad's evaluation form that examination of extremities,

gait, deep tendon reflexes, the straight-leg-raise test and a psychological mental status

examination were all contemplated, yet not once did any of these blanks get filled in on the form,

resulting in a complete lack of any clinical technique or test on which his opinion might be

based, other than the MRI performed the year before in Florida.  The MRI was reviewed by Drs.

Green and Georgy, both of whom found that it did not establish a medically determined

impairment.

Based on the foregoing, I find the conclusion ineluctable that Dr. Mourad's opinions are

unpersuasive and not entitled to controlling weight, consistent with the ALJ's finding.  The

difficulty is that the ALJ's analysis is not clearly set forth.  Rather, the foundation of the ALJ's

ruling is, at best, obscure and is partly based on what the Commissioner's brief concedes is error. ECF No. 10 at 19. Nevertheless, when examined closely, it is clear that these deficits do not require remand.

The principal stated basis for the ALJ's decision is the vague statement that Dr. Mourad's opinions are "conclusory in nature." Tr. 30. However, this rationale is fleshed out by the ALJ's reference to 20 C.F.R. § 404.1527, which provides that a treating source's opinion is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory findings and is not inconsistent with other substantial evidence in the record; it also provides that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(2-3); see Berríos Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (reports containing "brief conclusory statements or the mere checking of boxes" are "entitled to relatively little weight"). In addition, the ALJ's decision repeatedly juxtaposes Dr. Mourad's conclusory statements with the inconsistent findings of Drs. Palumbo and Unger, as well as with the Florida MRI. Relatedly, the ALJ's Step Two analysis mentions the absence in Dr. Mourad's treating notes of the specific diagnostic criteria for fibromyalgia and of any signs or laboratory findings establishing a severe impairment. Read together, it is clear that the ALJ's treatment of Dr. Mourad's opinions is proper because of their inconsistency with the balance of the medical evidence, and because of the dearth of medically acceptable clinical and laboratory findings in his treating records needed to support those opinions. See Berríos Lopez, 951 F.2d at 431; Keating, 848 F.2d at 276 (ALJ may discount treating source's opinion when it is contradicted by other medical evidence including reports from non-treating, non-examining doctors).

The ALJ's remaining reason to discount the weight given to Dr. Mourad is erroneous – the ALJ wrongly found that Dr. Mourad improperly assessed Plaintiff's "ability to engage in basic work like activities," thereby usurping an issue reserved to the Commissioner.  This simply mischaracterizes Dr. Mourad's opinions, which do not speak on the ultimate issue, but rather provide a function-by-function analysis of Plaintiff's extreme (in Dr. Mourad's view) limitations.  The Commissioner argues that this error is harmless because the ALJ's primary rationale is well supported by substantial evidence.  I agree; no purpose would be served by remanding for the ALJ to remove the suspect language from his decision.  See Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000) ("[R]emand is not essential if it will amount to no more than an empty exercise.").

With no reversible error in the ALJ's treatment of Dr. Mourad's opinion and treating notes, what remains is the ALJ's well-supported Step Two determination based on Dr. Palumbo's examination report and the examining opinions of Drs. Green and Georgy that neither back pain nor fibromyalgia constituted severe impairments.  See Ferrazzano-Mazza v. Colvin, CA No. 14-239ML, 2015 WL 4879002, at *15-18 (D.R.I. Aug. 14, 2015) (whether fibromyalgia was properly diagnosed, no reversible error when finding that it did not cause disabling pain was well supported by SSA examining physicians); David v. Astrue, CA No. 10-314M, 2011 WL 2837509, at *10-11(D.R.I. June 17, 2011) (ALJ properly relied on assessments of State agency physicians who acknowledged the claimant's fibromyalgia diagnosis, but found that symptoms did not preclude work), adopted, 2011 WL 2836369 (D.R.I. July 14, 2011).  Finding no material error, I recommend that the ALJ's Step Two determination be affirmed.

C.     **ALJ's Mental RFC Finding**

There is no need to linger long on Plaintiff's challenge to the ALJ's well-supported mental RFC.  Plaintiff is simply incorrect when she argues that the mental RFC was based solely on the ALJ's lay interpretation of the medical evidence because he rejected the opinions of the SSA examining psychologists Drs. Warren and Hughes.  The ALJ did not reject these opinions – rather he afforded them substantial weight and based his mental RFC on them.  Specifically, each psychologist noted that Plaintiff had certain mental limitations; based on these limitations, each provided a narrative opinion that Plaintiff had the mental RFC to perform simple tasks over the course of a normal work schedule, to relate adequately with supervisors and co-workers, and to adapt to routine workplace changes, with a restriction on interaction with the general public. That is exactly what the ALJ incorporated in his RFC.  Tr. 29-31.  Plaintiff's argument is without merit.

## VIII.   Conclusion

Based on the foregoing, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 9) be DENIED and Defendant's Motion for an Order Affirming the Commissioner's Decision (ECF No. 10) be GRANTED.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
August 19, 2016